United States District Court
Southern District of Texas
**ENTERED**
July 19, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| IN RE JIMIE DIANNE OWSLEY, | § | |
| | § | |
| Appellant. | § | Civil Action No. 2:20-cv-00171 |
| | § | |

<u>**MEMORANDUM OPINION & ORDER**</u>

Appellant Jimie Dianne Owsley appeals from the Bankruptcy Court's disbursement of proceeds that were obtained through the sale of a property co-owned by Jimie Owsley and her ex-husband, Appellee Brian Owsley. (Dkt. No. 15). Alternatively, Jimie Owsley moves for certification of a direct appeal to the Fifth Circuit pursuant to 28 U.S.C. § 158. (Dkt. No. 11).

This case is the culmination of the Parties' lengthy state divorce proceedings. There, Jimie Owsley was ordered to carry the mortgage and refinance the co-owned property. If she failed to refinance, the property was to be sold and the net sales proceeds were to be split equally between the Parties. Jimie Owsley failed to refinance and Brian Owsley obtained a state court enforcement order requiring the sale of the property. Jimie Owsley appealed that enforcement order, stopped making payments on the mortgage, and filed for bankruptcy in federal court. Following the sale of the property, the Bankruptcy Court relied on the state court enforcement order and disbursed the proceeds equally between the Parties with no offset for Jimie Owsley's pre-sale mortgage payments. Jimie Owsley contends the Bankruptcy Court erred because it should have turned to Texas common law or the Parties' original divorce decree—not the state court enforcement order. In Jimie Owsley's Motion for Certification of a Direct Appeal, she argues that the Bankruptcy Court's alleged error warrants the Fifth Circuit's immediate attention. Based on the following, this Court finds that certification is unwarranted and, further, that the Bankruptcy Court correctly

construed and relied upon the enforcement order in disbursing funds equally.  Jimie Owsley's

Motion is therefore **DENIED** and the Bankruptcy Court's Order is **AFFIRMED**.

## I.    BACKGROUND

### A.    STATE PROCEEDINGS

#### 1.    <u>The Final Decree of Divorce</u>

On February 19, 2016, Jimie and Brian Owsley obtained a Final Decree of Divorce (the

"Final Decree") in Texas state court in Nueces County.  (Dkt. No. 7-1 at 99–132).  Three specific

orders within the Final Decree are relevant to this case.  First, Jimie Owsley was awarded a

property co-owned by the Parties at 7590 Rancho Destino Road in Las Vegas, Nevada (the "Vegas

Property"), but the Court expressly conditioned this award on the requirement that Jimie Owsley

refinance the property in her name alone, thus absolving Brian Owsley from financial

responsibility for the remainder of the note.  (Dkt. No. 12-1 at 43–44).  Second, the Final Decree

ordered Jimie Owsley to carry the mortgage on the Vegas Property:

> IT IS ORDERED AND DECREED that the wife, JIMIE DIANNE
> OWSLEY, *shall pay*, as a part of the division of the estate of the
> parties, and shall indemnify and hold the husband and his property
> harmless from any failure to so discharge . . . [t]he *balance due*,
> including principal, interest, tax, and insurance escrow, on the
> promissory note executed by JIMIE DIANNE OWSLEY and
> BRIAN LEON OWSLEY, in the original principal sum of
> $413,000.00, dated March 27, 2013, payable to Guild Mortgage
> Company and secured by deed of trust on the real property awarded
> in this decree to the wife.

(Dkt. No. 12-1 at 46) (emphases added).  Thus, the requirement that Jimie Owsley should continue

making mortgage payments was *not* explicitly subject to any condition—she was to assume

responsibility for the mortgage payments no matter what.  Further, she was ordered to pay only

the ongoing balance "due," and was not necessarily responsible for any total deficiency owing on

the promissory note.

Third, in a separate section, the Final Decree ordered Jimie Owsley to refinance the Vegas Property in her sole name within 60 days or, failing that, the Vegas Property was to be sold:

> IT IS ORDERED AND DECREED that JIMIE DIANNE OWSLEY shall do everything within her ability to attempt to refinance the mortgage on said real property in her sole name within 60 days from the date of this decree. *If* the mortgage on the real property cannot be refinanced . . . *then* the [Vegas Property] shall be sold. IT IS ORDERED AND DECREED that if the real property is sold any *net sales proceeds* shall be *split equally* between the JIMIE DIANNE OWSLEY and BRIAN LEON OWSLEY and likewise, JIMIE DIANNE OWSLEY and BRIAN LEON OWSLEY shall each pay 50 percent of any *deficiency owing* on the mortgage *after* the sale of the real property.

(*Id.* at 46–47) (emphases added).  Note that, unlike the order requiring Jimie Owsley to assume the ongoing mortgage payments, the sale of the Vegas Property was expressly conditioned upon Jimie Owsley's failure to refinance.  Note also that the contours of the "net sales proceeds" to be "split equally" were not explicitly defined.  But however vague the term "net sales proceeds" might have been, the Final Decree made clear that the Parties were to share equal responsibility for any "deficiency owing . . . after" the sale—as contrasted with Jimie Owsley's unconditional responsibility for any periodic "balance due" during the life of the mortgage.

The Final Decree's contingency provision concerning the sale of the Vegas Property is relevant because Jimie Owsley failed to accomplish the refinance of the Vegas Property by the 60-day deadline.[1]  (Dkt. No. 12-1 at 4); (Dkt. No. 11 at 2); (Dkt. No. 12 at 2).

---

[1]     Jimie Owsley asserts that she was unable to accomplish this refinance by the 60-day deadline because Brian Owsley "would not execute the contract." (Dkt. No. 11 at 2).  Brian Owsley responds to this allegation by merely noting that "[Jimie Owsley] never refinanced the mortgage . . . and never removed [Brian Owsley's] name . . . as required pursuant to the Final Divorce Decree." (Dkt. No. 12 at 2).  The Court finds the cause of Jimie Owsley's failure to refinance irrelevant to this analysis.

2.      **The Enforcement Orders**

After Jimie Owsley failed to refinance, Brian Owsley sought to enforce the Final Decree in Texas state court on multiple occasions.  The first such occasion was on September 30, 2016, when the state court granted Brian Owsley's motion to enforce the Final Decree by ordering that he sell the Vegas Property himself and divide the proceeds equally with Jimie Owsley ("First Enforcement Order").   (Dkt. No. 12-1 at 5).   On November 30, 2017, however, the First Enforcement Order was reversed by the Thirteenth Court of Appeals for defective service.  *Owsley v. Owsley*, No. 13-17-00025-CV, 2017 WL 5953097, at *3 (Tex. App.—Corpus Christi Nov. 30, 2017, no pet.) (mem. op.).

After the Texas appellate court reversed the First Enforcement Order, Brian Owsley filed another motion to enforce the Final Decree.  On August 20, 2018, the Texas state court granted Brian Owsley's second motion to enforce the Final Decree by ordering Brian Owsley to sell the Vegas Property ("Second Enforcement Order"). (Dkt. No. 12-1 at 11).  In doing so, the state court noted that, pursuant to Section 9.006 of the Texas Family Code, it needed to "specif[y] more precisely the manner of effecting the prior order for the sale of real estate and improvements."[2] (*Id.* at 9–10).  In relevant part, the Second Enforcement Order echoed the Final Decree's command to split equally the Vegas Property's "net sales proceeds," but it further defined that term as "gross sales price less customary closing costs (e.g. *outstanding* mortgage balance, outstanding taxes, realtor fees, title company fees, etc.)."   (*Id.* at 11) (emphasis added).   Notably, the Second Enforcement Order's definition of "net sales proceeds" did not explicitly include any offset for the payments being made by Jimie Owsley on the mortgage's "balance due" pursuant to the Final

---

[2]      Section 9.006 of the Texas Family Code provides that, in an enforcement order, the court "may specify more precisely the manner of effecting the property division previously made or approved if the substantive division of property is not altered or changed."  TEX. FAM. CODE § 9.006.

Decree.  (*Id.*).  The Second Enforcement Order did, however, explicitly provide an offset for the "outstanding mortgage balance," which flows directly from the Final Decree's mandate that the Parties split equally any "deficiency owing . . . after" the sale of the Vegas Property.  (*Id.* at 11, 47).  The state court further ordered Jimie Owsley to sign all documents required to effect the sale within 72 hours of presentment.  (*Id.* at 11).  According to Brian Owsley, he retained a realtor to sell the Vegas Property but Jimie Owsley refused to sign the necessary paperwork.  (Dkt. No. 12 at 3).

Jimie Owsley appealed the Second Enforcement Order on November 16, 2018 to the Texas Thirteenth Court of Appeals.  *See* Notice of Appeal, *Owsley v. Owsley*, No. 13-18-00636-CV (Tex. App.—Corpus Christi Nov. 16, 2018).  On November 29, 2018, the Thirteenth Court of Appeals ordered mediation.  *See* Order Issued, *id.* (Tex. App.—Corpus Christi Nov. 29, 2018).  After mediation proved unsuccessful, the appellate court reinstated the case on February 8, 2019.  *See* Case Reinstated, *id.* (Tex. App.—Corpus Christi Feb. 8, 2019).  But before any brief was filed, Jimie Owsley filed a Suggestion of Bankruptcy[3] and was granted a stay in the Texas appellate proceedings on March 7, 2019.  *See* Order Issued, *id.* (Tex. App.—Corpus Christi Mar. 7, 2019). That case remains pending before the Thirteenth Court of Appeals.[4]

---

[3]     "A suggestion of bankruptcy is a notice filed in an ongoing civil suit, usually a debt collection action that is stayed by filing of a petition in bankruptcy.  The suggestion gives notice to the court and to the parties of the bankruptcy filing, as well as notice of the federal stay on the pending matters."  Suggestion of Bankruptcy, The Wolters Kluwer Bouvier Law Dictionary Desk Edition (2011–2012 eds. 2012).

[4]     Brian Owsley asserts that the state court granted his motion for yet a Third Enforcement Order on February 8, 2019.  (Dkt. No. 12 at 3); (Dkt. No. 22 at 15).  He claims that, during a hearing, the state court ordered Jimie Owsley to sell the Vegas Property and provide Brian Owsley with one-half of the proceeds. (Dkt. No. 12 at 3).  The record contains no evidence of this hearing.  The record does demonstrate, however, that on the day following the alleged Third Enforcement Order, February 9, Jimie Owsley signed a document authorizing a real estate company to sell the Vegas Property.  (Dkt. No. 7-1 at 307–20).  Brian Owsley states without explanation that, because Jimie Owsley had already filed for bankruptcy on February 7, he was not able to sign the same authorization himself and no sale was consummated.  (*Id.*); (Dkt. No. 12 at 3).

B.    FEDERAL PROCEEDINGS

1.    Bankruptcy Court

On February 7, 2019, Jimie Owsley filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of Texas.[5]  (Dkt. No. 7 at 30–37).  Jimie Owsley stopped making mortgage payments on the Vegas Property after March 2019.  (*Id.* at 256).  On June 7, 2019, the mortgage company holding the note for the Vegas Property—Guild Mortgage Company—moved for relief from the automatic stay on that property due to Jimie Owsley's default.  (*Id.* at 249–51).  A week later, the Bankruptcy Court held a hearing on the motion and issued a continuance to afford the parties time to reach an agreement regarding the sale of the Vegas Property.  (Dkt. No. 12 at 3). After six months of jostling over the sale price, the Vegas Property was finally sold in January 2020 for $700,000.  (Dkt. No. 7 at 430); (Dkt. No. 12 at 5).  After the debt to Guild Mortgage and other transaction costs were deducted from the sale price, the proceeds amounted to $265,620.72. (Dkt. No. 15-3 at 189).  That amount was subsequently deposited into the Bankruptcy Court's registry.  (*Id.*).

On June 17, 2020, the Bankruptcy Court held a hearing to determine the disbursement of the funds.  (*Id.* at 185–205).  Brian Owsley argued that the Bankruptcy Court should disburse the funds equally without offsetting Jimie Owsley's mortgage payments pursuant to the Second Enforcement Order, which in turn relied on the Final Decree.  (*Id.* at 194–95, 201).  Jimie Owsley argued that the Bankruptcy Court should look not to the language in the Second Enforcement Order, but rather, to "Texas law," which, she claimed, "provides for a right of reimbursement for co-owners."  (*Id.* at 203).  The Bankruptcy Court denied Jimie Owsley's request, stating that, although Texas law sometimes allows a right of reimbursement, here the Bankruptcy Court had "a

---

[5]    Although Jimie Owsley originally filed under Chapter 13, her case was later converted to a Chapter 11 bankruptcy.  (Dkt. No. 7 at 30–37, 211).

very specific order" to follow, that is, the Second Enforcement Order. (*Id.*). Specifically, the Bankruptcy Court relied on the Second Enforcement Order's explicit instruction to split the net sales proceeds of the Vegas Property equally between the Parties without any offset for Jimie Owsley's prior mortgage payments. (*Id.* at 201–04).

Jimie Owsley also argued that the Second Enforcement Order *itself* should be interpreted to allow her prior mortgage payments to be deducted from the net sale proceeds before disbursement. (*Id.* at 201). The Bankruptcy Court disagreed, finding that prior mortgage payments are unlike the examples of customary closing costs the Second Enforcement Order stated should be subtracted before disbursement, such as "outstanding taxes," "realtor fees," and "title company fees." (*Id.* at 202).

For these reasons, the Bankruptcy Court required equal disbursement of the Vegas Property funds without any offset for Jimie Owsley's prior mortgage payments. (*Id.* at 204). And it issued a concise, written order following the hearing to that effect. (Dkt. No. 7-1 at 283).

## 2.   <u>District Court</u>

On July 1, 2020, Jimie Owsley filed a Notice of Appeal in this Court and an Emergency Motion for Stay Pending Appeal in the Bankruptcy Court. (Dkt. No. 7-1 at 618–621). The Bankruptcy Court denied her Motion for Stay two days later on July 6. (*Id.* at 623–24). The very next day, July 7, Jimie Owsley filed a Motion for Stay the Bankruptcy Court's order in this Court, which was denied on July 8. (Dkt. Nos. 2, 6). On August 17, 2020, Jimie Owsley filed the instant Motion for Certification of Direct Appeal to the Fifth Circuit. (Dkt. No. 11). As this Court held over that Motion, Jimie Owsley then filed her opening Brief on November 2, 2020, (Dkt. No. 15), and Brian Owsley submitted his Response on December 14, 2020 (Dkt. No. 22). Both the Motion and the appeal are ripe for review.

## II.    DISCUSSION

Jimie Owsley moves for a certification of direct appeal and, alternatively, appeals the Bankruptcy Court's disbursement of funds from the Vegas Property.  (Dkt. Nos. 11, 15).  The Court addresses each request in turn, finding that certification of direct appeal is not appropriate and the Bankruptcy Court did not err in its judgment.

### A.    CERTIFICATION OF DIRECT APPEAL

A party may appeal from a bankruptcy court directly to the appropriate court of appeals if the district court certifies, in relevant part, that (1) the order "involves a question of law as to which there is no controlling decision" from the Fifth Circuit or the Supreme Court or which "involves a matter of public importance"; (2) the order "involves a question of law requiring resolution of conflicting decisions"; or (3) an immediate appeal from the order "may materially advance the progress of the case or proceeding in which the appeal is taken."  28 U.S.C. § 158(d)(2)(A).  Jimie Owsley asserts that the first and third of these circumstances justify direct certification here.  (Dkt. No. 11 at 5–10).  The Court is unpersuaded.

With respect to the first circumstance, Jimie Owsley contends this Court should certify direct appeal because this case presents seven novel questions of law in the Fifth Circuit.  (Dkt. No. 11 at 7–8).  Brian Owsley disagrees that her appeal presents so many issues, arguing instead that only one issue is relevant and that it requires a "straight-forward reading of the plain language" of the "controlling" Second Enforcement Order.  (Dkt. No. 12 at 8–9).

The Court finds that the seven "issues" presented by Jimie Owsley for direct certification boil down to just two:[6] (1) Was the Bankruptcy Court bound by the Second Enforcement Order in determining the proper division of the proceeds from the Vegas Property? and (2) Did the Bankruptcy Court properly construe the language of the Second Enforcement Order to bar or preclude Jimie Owsley from obtaining an offset for her prior mortgage payments?

As will be demonstrated below at Section II.B, both issues presented by this case are resolvable by application of legal principles that are well-settled in the Fifth Circuit.  The first issue involves the federal "full faith and credit" statute, 28 U.S.C. § 1738, and thus Texas's issue preclusion doctrine.  The second issue concerns straightforward and longstanding principles of

---

[6]   The issues listed in Jimie Owsley's Motion are as follows:

1.   Whether the bankruptcy court erred when it determined that [Jimie Owsley] was not entitled to reimbursement claim incurred on the Las Vegas Property as co-owner under Texas Law for making payments and expenses in relation to the maintenance of the property;

2.   Whether the bankruptcy court erred when it did not deduct [Jimie Owsley's] total expenses from the registry funds prior to disbursing the funds;

3.   Whether the bankruptcy court erred when it did not provide an offset to [Jimie Owsley] for the mortgage payments made for several years post-divorce prior to the sale of the house;

4.   Whether the bankruptcy court erred when it determined the amount of "net sale proceeds" and what constituted "net sale proceeds";

5.   Whether the bankruptcy court erred when it relied on an enforcement order rather than the controlling final decree of divorce to determine calculation of "net sale proceeds";

6.   Whether the bankruptcy court erred when it relied on a written order rather than authority in Texas law that allows for right of reimbursement for co-owners; and

7.   Whether the bankruptcy court erred when it split the money in the court's registry 50/50 between [Jimie Owsley] and [Brian Owsley].

(Dkt. No. 11 at 4–5).  The first, second, third, fourth, sixth, and seventh "issues" are basically one and the same: whether Jimie Owsley should have received a "reimbursement," "deduct[ion]," "offset," a greater portion of the "net sale proceeds," or more than a "50" percent share of the Vegas Property funds due to her post-Final Decree mortgage payments pursuant to "Texas law."  These formulations effectively ask this Court to rule on the merits of whether she should be reimbursed for the mortgage payments she made following the Final Decree.  By contrast, the fifth issue narrows on a different and higher order question concerning effect of the Texas state court's Second Enforcement Order which purported to divide the Vegas Property's net sale proceeds.  If the Bankruptcy Court was bound by and properly construed the Second Enforcement Order, Jimie Owsley's other "issues"—which cut to the merits of her claim for reimbursement—are inappropriate for this Court to consider.

legal interpretation.  Therefore, this case cannot be certified for direct appeal based upon any lack of controlling precedent.

The Court also disagrees with Jimie Owsley's assertion that questions of law in this case involve a matter of public importance.  Jimie Owsley attempts to frame this case as touching issues that have "reaching effects to all future and past divorce and bankruptcy agreements," which are all the more concerning in light of the increase in bankruptcy and divorce filings courts are "seeing or are anticipating" in light of the COVID-19 pandemic.  (Dkt. No. 11 at 8–9).  Brian Owsley succinctly retorts that this case is a "purely private dispute." (Dkt. No. 12 at 9–10).  Brian Owsley is correct.  Because the Court finds that this case presents no novel issues, Jimie Owsley's concerns over any precedential value this case might provide are misplaced.  Even if outside circumstances produce many future cases with exactly the same entanglements here, those courts may rely on the same well-established precedents relied on by this Court.  Accordingly, certification is not warranted based on the presence of any matter of public importance.

Lastly, with respect to Jimie Owsley's argument that certification will materially advance the progress of the case or proceeding before the Bankruptcy Court, the Court disagrees.  To this end, Jimie Owsley contends that an expedited resolution is necessary because the "significant" amount of money tied up in this case means it will very likely be appealed anyways, and because there are "multiple other proceedings" that somehow depend on the resolution of this case.  (Dkt. No. 11 at 9–10).  The Court is unpersuaded that $265,620.72 involved in this case is so exceptional that it warrants direct appeal.  *Cf. Slims v. Sunnyside Land, LLC*, 425 B.R. 284, 288–89, 295–96 (W.D. La. 2010) (denying leave to appeal where $9.6 million was at issue).  Nor does the Court find it necessary to permit a direct appeal in light of the vaguely identified "other proceedings" to which Jimie Owsley alludes.  Assumedly, Jimie Owsley may be referencing her appeal of the

Second Enforcement Order with the Texas Thirteenth Court of Appeals.  But regardless, the plain language of Section 158 is concerned with "the progress of the case or proceeding in which the appeal is taken."  28 U.S.C. § 158(d)(2)(A)(iii).  Jimie Owsley has supplied no reason for this Court to find that the Bankruptcy Court's proceedings might somehow be delayed by the pendency of this federal appeal, and the Court can discern none.

Accordingly, the Court finds that this case does not warrant certification of a direct appeal.

**B.     THE EFFECT OF THE SECOND ENFORCEMENT ORDER**

When a district court denies direct certification, it has appellate jurisdiction to review a bankruptcy court's final judgment or order.  28 U.S.C. § 158(a)(1).  A district court acting in this appellate capacity reviews a bankruptcy court's legal determinations *de novo* and findings of fact for clear error.  *In re Perry*, 345 F.3d 303, 308–09 (5th Cir. 2003).  Here, the Bankruptcy Court made two relevant legal determinations: (1) the Second Enforcement Order is owed preclusive effect and (2) the Second Enforcement Order's definition of "net sales proceeds" does not include any offset for mortgage payments made by Jimie Owsley between the Final Decree and the sale of the Vegas Property.  (Dkt. No. 15-3 at 202–03).  The Court reviews each determination *de novo*.

**1.     The Second Enforcement Order is Owed Preclusive Effect**

Jimie Owsley asserts that the Bankruptcy Court should have relied upon either the Final Decree or Texas common law when dividing the proceeds from the Vegas Property—*not* the Second Enforcement Order.  (Dkt. No. 11 at 5); (Dkt. No. 15 at 14–17, 18–20).  Her argument implies that the Second Enforcement Order should be ignored because it impermissibly altered the substantive division of property in the Final Decree and therefore is "void" under Texas law.[7]

_____

[7]     Namely, Jimie Owsley argues that the Bankruptcy Court, "[b]y relying on the [Second Enforcement Order], . . . did not effectuate the intended and agreed to meaning of the final divorce decree." (Dkt. No. 15 at 18).

(Dkt. No. 15 at 18–19).  Brian Owsley disagrees, arguing instead that the Second Enforcement Order was faithful to the language of the Final Decree and thus properly controlled the Bankruptcy Court's disbursement of the Vegas Property funds.  (Dkt. No. 12 at 8–9); (Dkt. No. 22 at 28–30). The Parties' disagreement invokes the "full faith and credit" guarantee of 28 U.S.C. § 1738, requires the Court to determine the nature of Jimie Owsley's instant attack on the Second Enforcement Order, and ultimately turns on whether the Second Enforcement Order satisfies Texas's jurisdictional standards.  Because the state court rendition of the Second Enforcement Order was within the bounds of its jurisdiction, Texas law precludes her from seeking to relitigate an issue that order settled.

### a.       The Full Faith & Credit Guarantee of 28 U.S.C. § 1738

As a general matter, the effect of an enforcement order of a Texas state court upon a federal court in a subsequent proceeding is not a novel issue.  In fact, it is well established.  Section 1738 of Title 28 of the United States Code provides that "judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken."  28 U.S.C. § 1738 (1948).  The Fifth Circuit has explained that, "[u]nder 28 U.S.C. § 1738, the federal courts *must* give a state court judgment the same preclusive effect in a subsequent federal case that it would be given in subsequent cases in the courts of that state."  *Salazar v. U.S. Air Force*, 849 F.2d 1542, 1546 (5th Cir. 1988) (emphasis added); *see also Adar v. Smith*, 639 F.3d 146, 151 (5th Cir. 2011) ("Simply put, the clause and its enabling statute created a rule of decision to govern the preclusive effect of final, binding adjudications from one state court or tribunal when litigation is pursued in another state or federal court."); *Plunk v. Yaquinto (In re Plunk)*, 481 F.3d 302, 307 (5th Cir. 2007) (applying Texas's preclusion laws in a federal bankruptcy proceeding where an issue had been previously

litigated in Texas state court).  Thus, the effect of the Second Enforcement Order on this proceeding must account for how Texas courts would treat that specific type of judgment.[8]

### b.    The Nature of Jimie Owsley's Attack

But before determining whether the product of a state judicial proceeding is owed full faith and credit, a court must identify the nature of a party's attack on the relevant judgment.  *See Browning v. Navarro*, 887 F.2d 553, 562 (5th Cir. 1989) (determining the nature of an attack on a state court judgment before conducting a full-faith-and-credit analysis).  Here, the Parties disagree as to whether and how Jimie Owsley seeks to undermine the Second Enforcement Order.  Brian Owsley argues Jimie Owsley is in reality attempting to appeal from the Second Enforcement Order and that this Court lacks jurisdiction to review that order pursuant to a rule of abstention known as the *Rooker-Feldman* doctrine.  (Dkt. No. 22 at 29); *see Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) and *District of Columbia Court of Appeals v. Feldman,* 460

---

[8]     Although no Party raises the issue, the Court notes that the Second Enforcement Order is the product of a State's "judicial proceeding" within the meaning of Section 1738.  The Supreme Court has made clear that "[o]rders commanding action or inaction" in one State are sufficient to "preclusively adjudicate the rights and obligations running between the parties" in proceedings before another State's courts.  *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 235, 118 S.Ct. 657, 554, 139 L.Ed.2d 580 (1998).  That is not to say an enforcement order of one State is sufficient pursuant to Section 1738 to compel another State—or, here, the federal judiciary—to *act*.  *See, e.g.*, *Adar*, 639 F.3d at 160 (holding that a "New York adoption decree cannot compel within Louisiana an official act within the exclusive province of that state" (quotation omitted)).  Indeed, "the mechanisms for enforcing a judgment do not travel with the judgment itself for purposes of full faith and credit."  *Id.* (quoting *Baker*, 522 U.S. at 239, 118 S.Ct. at 667).  The issue here, however, is not whether the Second Enforcement Order independently compels the Bankruptcy Court to disburse the proceeds from the Vegas Property—Jimie Owsley's bankruptcy action itself accomplishes that.  Rather, the question before the Court is whether the Bankruptcy Court properly determined that the Second Enforcement Order settles the issue of what each Party was owed from the Vegas Property proceeds.  A plain reading of the Second Enforcement Order demonstrates it was an "order commanding action" on the sale and distribution of the Vegas Property, and therefore the Second Enforcement Order preclusively determined the Parties' "rights and obligations" insofar as that property is concerned.  *See Baker*, 522 U.S. at 235, 118 S.Ct.at 665; *see also Salazar*, 849 F.2d at 1546–47 (granting full faith and credit to a "writ of garnishment" issued by a Texas state court which was meant to enforce a previous judgment award); *Mark v. Kuckenmeister*, 619 F.3d 1010, 1014, 1016 (9th Cir. 2010) (applying Section 1738 to a post-divorce-decree "order" which named the wife as the alternate payee of a retirement account).    Accordingly, the Court is satisfied that the Second Enforcement Order is the product of a "judicial proceeding" within the meaning of Section 1738.

U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).  On the other side, Jimie Owsley at first argues that the Second Enforcement Order should be ignored in favor of the Final Decree itself or Texas common law, (Dkt. No. 11 at 5); (Dkt. No. 15 at 18–19), but then in her Reply, she backpedals asserting that she is "not attacking" and does "not assail the legitimacy of" the Second Enforcement Order.  (Dkt. No. 23 at 23–25).  Rather, Jimie Owsley argues that she is merely seeking an "equitable determination that is consistent with the prior state court decisions."  (*Id.* at 25).  The Court finds that both Parties have missed the mark.

Brian Owsley's invocation of the *Rooker-Feldman* doctrine is ultimately inapt.  Although Brian Owsley is correct that under the *Rooker-Feldman* doctrine, "lower federal courts lack jurisdictional authority to sit in appellate review of state court decisions," *Matter of Reitnauer*, 152 F.3d 341, 343 (5th Cir. 1998),[9] the Fifth Circuit has also made clear that "the *Rooker-Feldman* doctrine does not preclude review of *void* state court judgments."  *Burciaga v. Deutsche Bank Nat'l Trust*, 871 F.3d 380, 385 (5th Cir. 2017) (emphasis added).  In Texas, a state court's judgment is "void" where the court lacked jurisdiction or the order was borne of fraud.  *See Browning v. Prostok*, 165 S.W.3d 336, 346–47 (Tex. 2005).  Thus, even where the *Rooker-Feldman* doctrine would bar federal review of a state court decision on the merits, federal courts are obligated to ensure that the state court's decision was rendered with proper jurisdiction.  *Cf. United States v. Shepherd*, 23 F.3d 923, 925 (5th Cir. 1994) (concluding that *Rooker-Feldman* applied only after

---

[9]    *See also Hale v. Harney*, 786 F.2d 688, 689–91 (5th Cir. 1986) (finding *Rooker-Feldman* stripped the federal court of jurisdiction over a suit which was inextricably intertwined with a state court divorce decree despite the fact that the state decree was pending on appeal).  The Fifth Circuit's holding in *Hale* as it pertains to *Rooker-Feldman's* applicability to situations where the state court judgment was pending review in a state appellate court has been dubbed in "tension" with other Fifth Circuit caselaw.  *Burciaga v. Deutsche Bank Nat'l Trust*, 871 F.3d 380, 384 n.5 (5th Cir. 2017); *see also Illinois Cent. R. Co. v. Guy*, 682 F.3d 381, 390 (5th Cir. 2012) (stating, in dicta, that *Rooker-Feldman* applies to "final judgment[s] rendered by a state's court of last resort"); *In re FM Forrest, Inc.*, 587 B.R. 891, 911–12 (Bankr. S.D. Tex. 2018) (examining the tension noted in *Burciaga* and concluding that, *Illinois Central* notwithstanding, *Hale*'s rule remains binding).

determining that the state court judgment was not "void" for fraud).  Thus, insofar as Jimie Owsley's attack on the Second Enforcement Order is confined to attacking the state court's jurisdiction to enter that order, this Court's jurisdiction is undisturbed by the *Rooker-Feldman* doctrine.

Jimie Owsley's attack on the Second Enforcement Order is aimed solely at the state court's jurisdiction to enter it.  Namely, Jimie Owsley argues that the Bankruptcy Court, "[b]y relying on the [Second Enforcement Order], . . . did not effectuate the intended and agreed to meaning of the final divorce decree."  (Dkt. No. 15 at 18); *see also* (Dkt. No. 11 at 5).  By so arguing, Jimie Owsley necessarily implies that the state court rendering the Second Enforcement Order acted beyond the bounds of its jurisdiction.  As will be explained in greater detail below, Texas law provides that state courts entering enforcement orders exceed their jurisdiction wherever they "modify" or "alter" the relevant final divorce decree.  *See* TEX. FAM. CODE § 9.007(a); *see id.* § 9.007(b) (describing such variation from the final decree of divorce as being "beyond the power of the divorce court and . . . unenforceable"); *DeGroot v. DeGroot*, 260 S.W.3d 658, 663 (Tex. App.—Dallas 2008, no pet.) (holding that the proscription of § 9.007 is "jurisdictional" in nature). Thus, Jimie Owsley's assertion that any reliance on the Second Enforcement Order would "not effectuate the intended and agreed to meaning" of the Final Decree implies that the Second Enforcement Order itself is void for want of jurisdiction.  Accordingly, the Court agrees with Jimie Owsley's framing of her argument insofar as she disclaims launching a direct attack on the merits of the Second Enforcement Order.

At the same time, the Court rejects Jimie Owsley's attempt at framing her argument as merely seeking an equitable remedy that is "consistent" with the relevant state court decisions, including the Second Enforcement Order.  For starters, in both her Motion for Direct Certification

of Appeal and her Opening Brief, Jimie Owsley repeatedly assails the Second Enforcement Order by arguing that the Bankruptcy Court erred in relying upon it. (Dkt. No. 11 at 5) (Dkt. No. 15 at 18–19). To be sure, it could be said that this argument forms the very core of her appeal. (*See, e.g.*, Dkt. No. 15 at 7–8 (describing the Bankruptcy Court's reliance on "the Second Enforcement Order's definition of 'net sales'" and stating that Jimie Owsley "now appeals that order"). In making this argument, Jimie Owsley has launched a type of "collateral" attack on the Second Enforcement Order. *Austin Ind. Sch. Dist. v. Sierra Club*, 495 S.W.2d 878, 881 (Tex. 1973); *see also Navarro*, 887 F.2d at 562 (describing a collateral attack as "incidental to the proceeding in which [the previous judgment] is made"). In general, collateral attacks do not seek to "set aside the former judgment," but rather, "depriv[e] [a party] of rights it apparently is entitled to enjoy under the [previous] judgment."[10] *Austin Ind. Sch. Dist.*, 495 S.W.2d at 881; *see also Browning v. Prostok,* 165 S.W.3d 336, 346 (Tex. 2005) ("A collateral attack is an attempt to avoid the binding force of a judgment . . . in order to obtain some specific relief which the judgment currently stands as a bar against."). Here, no party disputes that the Second Enforcement Order forms the basis of the Bankruptcy Court's manner of disbursing funds from the Vegas Property. (Dkt. No. 15 at 7); (Dkt. No. 12 at 9); (Dkt. No. 15-3 at 201–04). And by urging the Court to disregard the Second Enforcement Order, (Dkt. No. 15 at 18–20), Jimie Owsley effectively seeks to deprive Brian Owsley the rights he may be entitled to enjoy under the Second Enforcement Order in an incidental proceeding.

Putting these together, it is clear that Jimie Owsley has indeed launched an attack on the Second Enforcement Order, and that attack is both jurisdictional *and* collateral in nature.

---

[10] This case is by no means the first time a party in the Fifth Circuit has challenged a federal court's reliance on a previous state court judgment. *See, e.g.*, *Browning*, 887 F.2d at 562 (addressing a party's attempted collateral attack on a previous state court judgment).

        c.      The State Court's Jurisdiction to Enter the Second Enforcement Order

"When a collateral attack is made on the jurisdiction of a court to act, the existence of the court's jurisdiction must be determined from the record in the case." *E.D. Sys. Corp. v. Sw. Bell Tel. Co.*, 674 F.2d 453, 457 (5th Cir. 1982). And by *the record in the case*, the Fifth Circuit has made clear that review is limited to the "face" of "the state court record." *Shepherd*, 23 F.3d at 925. Here, the face of the state court's record demonstrates that it was acting within its proper jurisdiction when it rendered the Second Enforcement Order.

As alluded to above, a Texas court's jurisdiction to enforce a final decree of divorce can be evaluated *post hoc* by considering the degree to which the enforcement order varies from the final decree. On one hand, Texas courts are without jurisdiction to enter enforcement orders that would "amend, modify, alter, or change the division of property made or approved in the decree of divorce." Tex. Fam. Code § 9.007(a); *see also id.* § 9.007(b); *DeGroot*, 260 S.W.3d at 663; *see also McGehee v. Epley*, 661 S.W.2d 924, 926 (Tex. 1983) (finding that a court was without jurisdiction to "modify" a final divorce decree); *Troiani v. Troiani*, 2016 WL 4702685, at *4 (Tex. App.—Corpus Christi 2016, no pet.) (same). On the other hand, Texas law permits a court ruling on a motion to enforce to "specify more precisely" the property divisions made in a final divorce decree so long as "the substantive division of property is not altered or changed." *See* Tex. Fam. Code § 9.006; *see also id.* § 9.007(a) ("An order to enforce the division [of property] is limited to an order to *assist in the implementation of* or to *clarify* the prior order and may not alter or change the substantive division of property." (emphases added)). Accordingly, here, the state court's jurisdiction to enter the Second Enforcement Order turns on whether it was "altering" or merely "specifying more precisely" the division of the Vegas Property in the Final Decree.

Before comparing the Second Enforcement Order and the Final Decree, the Court pauses to lay out Texas's ground rules for interpreting such judgments. Texas courts "interpret divorce decree language" just as they would "other judgments of courts." *Hagen v. Hagen*, 282 S.W.2d 899, 901 (Tex. 2009). That is, Texas courts "construe the decree as a whole to harmonize and give effect to the entire decree." *Id.* "Whether a divorce decree is ambiguous is a question of law." *Id.* at 901–02. "If the decree is unambiguous," Texas courts "must adhere to the literal language used." *Id.* at 901. Conversely, "[i]f the decree is ambiguous," Texas courts interpret the divorce decree "by reviewing both the decree as a whole and the record." *Id.*

Here, the Final Decree unambiguously requires Jimie Owsley to continue making mortgage payments without any provision for a right of reimbursement. Specifically, the Final Decree states that Jimie Owsley "shall pay . . . the balance due . . . on the promissory note" for the Vegas Property. (Dkt. No. 12-1 at 46). And although her continued possession is conditioned upon her refinancing the Vegas Property, (*id.* at 44, 46–47), her duty to make mortgage payments is not. Thus, Jimie Owsley's responsibility for pre-sale mortgage payments, under the terms of the Final Decree, is absolute.

This reading is confirmed when considering the mortgage-payment assignment within the context of the entire Final Decree. Namely, the Final Decree demonstrates careful attention to the division of responsibility for the mortgage based upon *whether* and *when* the Vegas Property was sold. Whether the Vegas Property is sold at all determines if Brian Owsley carries any of the responsibility: only in the event that the Vegas Property were sold does Brian Owsley "pay 50 percent of any *deficiency owing* on the mortgage *after* the sale." (*Id.*) (emphasis added). When the Vegas Property is sold determines how many pre-sale mortgage payments Jimie Owsley would be required to make: she is unconditionally assigned responsibility for the "balance due" on the

note.  (*Id.* at 46).  Thus, the Final Decree uses precise language to split pre- and post-sale responsibility for the mortgage between the Parties.  Jimie Owsley might not prefer this bifurcated assignment, but it is not ambiguous.  Had the Final Decree sought to provide Jimie Owsley with a right to reimbursement for ongoing mortgage payments made *before* any sale, it easily could have done so.  It did not.  *Cf. Campbell v. Campbell*, No. 01-10-00562-cv, 2011 WL 2436513, at *2 (Tex. App.—Houston [1st Dist.] June 16, 2011, no pet.) (expressly ordering that any party making pre-sale mortgage payments would be reimbursed); *Carter v. Carter*, 736 S.W.2d 775, 781 (Tex. App.—Houston [14th Dist.] 1987, no writ) (expressly including "mortgage" payments in its definition of "all costs associated with the property").  And because Jimie Owsley did not appeal the Final Decree, she is bound by its terms.  *See Baxter v. Ruddle*, 794 S.W.2d 761, 762 (Tex. 1990) ("It is clear that *res judicata* applies to a final divorce decree to the same extent that it applies to any other final judgment.  If an appeal is not timely perfected from the divorce decree, *res judicata* bars a subsequent collateral attack." (internal citation omitted)).

With the Final Decree's division of responsibility for the Vegas Property mortgage in mind, it is clear that the Second Enforcement Order sought to specify more precisely—not alter—the terms of the Final Decree.  For starters, the Second Enforcement Order explicitly stated it was doing so.  (Dkt. No. 12-1 at 9–10) (citing Tex. Fam. Code § 9.006).  This Court finds no reason in the record to disagree with that self-assessment.  The Second Enforcement Order fully accounted for the fact that the Final Decree required the Parties to split the deficiency owing on the mortgage *after* the sale by defining "net sales proceeds" to include any "outstanding mortgage balance."  (*Id.* at 11).  Further, the Second Enforcement Order honored the Final Decree's unconditional assignment of ongoing mortgage payments *before* the sale of the property to Jimie Owsley by omitting mention of those payments in its definition of the net sales proceeds.  (*Id.*).  In other

19

words, the Second Enforcement Order perfectly toed the line set by the Final Decree as to whether and when each Party carried some responsibility for the mortgage note. Brian Owsley argues that, had the Second Enforcement Order done otherwise—such as to require Brian Owsley to assume half-responsibility for the pre-sale mortgage payments by deducting them from the net sales proceeds—it would have modified the Final Decree. (Dkt. No. 22 at 26). The Court agrees. Thus, the state court was well within its jurisdiction to render the Second Enforcement Order *because of*, not despite, its refusal to deduct Jimie Owsley's mortgage payments from the net sales proceeds.

Jimie Owsley argues that Texas law compels a different result by laying out a string of legal propositions. She first avers, without citation or explanation, that the Final Decree did not actually "divide" or "dispose of" the Vegas Property. (Dkt. No. 15 at 16, 19). Therefore, the Parties owned the Vegas Property as tenants-in-common upon her failure to refinance pursuant to a default rule in Texas. (*Id.*). And because the Parties owned the Vegas Property as tenants-in-common, Jimie Owsley claims, she is entitled to the equitable doctrine of reimbursement for the mortgage payments she made in the interim between the Final Decree and the property's sale. (*Id.* at 18–19). Moreover, Jimie Owsley argues, the Final Decree failed to detail the contents of the net sales proceeds that were to be split between the Parties in the event the Vegas Property were sold, and therefore Texas common law supplies a definition that "includes mortgage payments." (*Id.* at 19–20). The Court disagrees.

First, the Final Decree clearly divided and disposed of the Vegas Property. Namely, it awarded to Jimie Owsley the right to continue possessing the Vegas Property subject to the condition that she refinance it immediately thereby absolving Brian Owsley of any liability for the outstanding note. (Dkt. No. 12-1 at 43–44). When she failed that condition, the Parties were required to sell the Vegas Property and "split equally" the net sales proceeds and the responsibility

for any deficiency still owing on the mortgage.  Although providing for two contingencies, the Final Decree unequivocally disposed of the Vegas Property and set unmistakable, precisely defined parameters for its division.  *Cf. Busby v. Busby*, 457 S.W.2d 551, 552 (Tex. 1970) (stating unequivocally that "no disposition whatever" was made of certain retirement benefits in controversy); *Ellis v. Zieben*, No. 01-04-00436-cv, 2005 WL 1308706, at *1 (Tex. App.—Houston [1st Dist.] Jun. 2, 2005, pet. denied) (mem. op.) (stating unequivocally that a divorced decree "did not partition" a corporation that "had been community property during marriage" and therefore it "remained unpartitioned property").  Namely, the Final Decree placed the burden of satisfying the ongoing mortgage payments squarely, solely, and unconditionally upon Jimie Owsley's shoulders.  Jimie Owsley cannot now argue that a default common ownership rule in Texas for undisposed property somehow leads to her right to equitable reimbursement for those mortgage payments.

Second, Jimie Owsley's attempt to squeeze reimbursement for her pre-sale mortgage payments into the definition of net sales proceeds ignores the plain language of the Final Decree.  The Final Decree clearly ordered her to assume the responsibility for the monthly mortgage payments and did not subject that requirement to the condition that she put the mortgage in her name.  Jimie Owsley's proposed reading would impermissibly modify the Final Decree by effectively neutering its unconditional mandate that she and she alone continue making monthly mortgage payments.  In other words, no matter how expansive one might consider the term net sales proceeds, it most certainly cannot—in the context of this particular divorce decree—include Jimie Owsley's pre-sale mortgage payments based on the proper reading of the entire Final Decree.  *See Hagen*, 282 S.W.2d at 901.

Accordingly, the state court rendering the Second Enforcement Order did not exceed the bounds of its jurisdiction.  The Court must now turn to the effect of that order on this Court.

      d.      Issue Preclusion Applies

Pursuant to Section 1738, this Court must accord full faith and credit to the Second Enforcement Order pursuant to Texas's treatment of the same. *See* 28 U.S.C. § 1738. Relevant here is Texas's collateral estoppel doctrine.[11] *See Plunk*, 481 F.3d at 307.

Brian Owsley argues that the Second Enforcement Order's particular definition of the Vegas Property net sale proceeds "is controlling regarding the *issue* before this Court." (Dkt. No. 22 at 30) (emphasis added). In Texas, a party invoking issue preclusion, or collateral estoppel, must demonstrate that "(1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Plunk*, 481 F.3d at 307 (quoting *John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268, 288 (Tex. 2002)).

Here, Brian Owsley satisfactorily demonstrates that issue preclusion applies to the Second Enforcement Order's particular division of the Vegas Property's net sales proceeds. First, Brian Owsley shows that the Second Enforcement Order was issued after the Texas state court heard evidence at a trial. (Dkt. No. 22 at 27); (Dkt. No. 12-1 at 8–9). Second, Brian Owsley explains how the state court's clarification of the Final Decree's definition of net sales proceeds was essential to the Second Enforcement Order, as that court clearly went out of its way to note that it was specifying more precisely the manner of effecting the Final Decree's division of the Vegas Property. (Dkt. No. 22 at 28–29); (Dkt. No. 12-1 at 9–10). Third, Brian Owsley demonstrates that he and Jimie Owsley were adversarial by alluding to the trial that preceded the Second Enforcement Order, and also by disclosing that the divorce proceedings in general were

---

[11]     Texas law allows the application of preclusion doctrines to post-divorce orders to enforce final divorce decrees. *See, e.g.*, *Gainous v. Gainous*, 219 S.W.3d 97, 105 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) ("Res judicata applies to final divorce decrees and, under the same logic, applies to final post-divorce orders.").

"contested" and "became contentious."  (Dkt. No. 22 at 25, 27).  Accordingly, Brian Owsley has satisfied his burden to demonstrate that Texas's doctrine of issue preclusion applies to the Second Enforcement Order's particular division of the Vegas Property's net sale proceeds.

Jimie Owsley nevertheless contends that Texas's preclusion doctrine should not apply because the state court made "no findings concerning *reimbursement*" and stated nothing in its order precludes her "equitable *reimbursement* claim."  (Dkt. No. 23 at 26).  This is a red herring. Although it is technically accurate that the state court made no specific findings or rulings as it pertains to "reimbursement," the Second Enforcement Order unquestionably made specific findings as to the proper *disbursement* of the Vegas Property's net sales proceeds: "one-half . . . to Jimie Owsley . . . and one-half to Brian."  (Dkt. No. 12-1 at 11).  The fact that reimbursement was not expressly mentioned in the Second Enforcement Order's disbursement finding is not grounds for arguing that preclusion does not apply; the list of things the Second Enforcement Order did not expressly exclude in its definition of net sales proceeds is myriad.  To say preclusion does not attach because any one item went unmentioned defeats the very purpose of collateral estoppel. And further, as explained above, the state court defined net sales proceeds in a manner that comports with the Final Decree and leaves no room to suggest Jimie Owsley has a right to reimbursement.  Thus, the state court rendering the Second Enforcement Order made specific findings as it pertains to the exact issue that was before the Bankruptcy Court: the proper disbursement of net sales proceeds from the Vegas Property.

Jimie Owsley also suggests that even if a preclusion doctrine applies based on the Second Enforcement Order, the Court should take judicial notice of her appeal of that order in the Texas appellate court.  (Dkt. No. 23 at 26).  It is unclear whether by making this argument Jimie Owsley means to imply that this Court should stay its decision regarding the preclusive effect of the Second

Enforcement Order in light of the Texas appellate proceedings.  Assuming she so intended, the Court declines to do so under the specific circumstances here.

Initially, a Texas state court's "judgment is final for the purposes of issue and claim preclusion despite the taking of an appeal unless what is called an appeal actually consists of a trial de novo."[12]  *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 6 (Tex. 1986); *see also Aguillard v. McGowen*, 207 F.3d 226, 229 (5th Cir. 2000) (acknowledging the holding of *Scurlock Oil*); *Zatarain v. WDSU-Television, Inc.*, 79 F.3d 1143, 1996 WL 97105, at *2–3 (5th Cir. 1996) (unpublished) (applying Louisiana's preclusion doctrine pursuant to Section 1738 to a state trial court judgment that was pending on appeal in light of a Louisiana statute that deems trial court judgments sufficiently final for preclusion purposes).  No party has suggested that the appeal of the Second Enforcement Order consists of a "trial de novo," therefore that appeal does not prevent the application of issue preclusion here.

Notwithstanding the applicability of collateral estoppel pursuant to *Scurlock Oil*, the Fifth Circuit has noted that, "irrespective of whether the judgment in the state court" is owed preclusive effect, sometimes a stay of the federal proceedings is appropriate "until a final termination of the proceedings in the state court."  *Ray v. Hasley*, 214 F.2d 366, 368 (5th Cir. 1954).  In weighing the appropriateness of a stay, "the federal court should take into consideration the possibility of a reversal of that judgment" and should seek to "avoid any conflict of jurisdiction and . . . accomplish

---

[12]    Note that this principle articulated in *Scurlock Oil* represented an intentional change in Texas law at that time.  *Cf. Texas Trunk Railway Co. v. Jackson*, 85 Tex. 605, 22 S.W. 1030, 1032 (1893) (denying finality to trial court judgments for preclusion purposes while those judgments were pending on appeal); *Ray v. Hasley*, 214 F.2d 366, 368 (5th Cir. 1954) ("In Texas, the rule seems well established that the pendency of an appeal from a judgment prevents its operation as res judicata." (citation omitted)).  Fittingly, the Texas Supreme Court in *Scurlock Oil* justified its new rule by decrying a situation similar to the one at bar, where a husband had obtained a final divorce decree in Texas that benefited him in some measure, the wife appealed to a Texas appellate court, and then, during the pendency of that appeal, the wife sought and obtained relief in a Connecticut state court which for all practical purposes nullified the husband's beneficial Texas ruling.  724 S.W.2d at 6 (citing *Nowell v. Nowell*, 254 A.2d 889, 894 (1969)).

substantial justice." *Id.*; *see also Superior Oil Co. v. City of Port Arthur*, 535 F. Supp. 916, 921 (E.D. Tex. 1982) (staying resolution of the federal case until termination of the parallel state proceedings and citing *Ray*).

Here, the *Ray* factors weigh against staying this case. Although it remains a real possibility that the Texas appellate court may reverse the Second Enforcement Order, Jimie Owsley's effort to obtain reimbursement for her pre-sale mortgage payments is also precluded by the Final Decree itself. As demonstrated above, the Second Enforcement Order's definition of "net sales proceeds" comports just so with the Final Decree's mandate that Jimie Owsley unconditionally shoulder the Party's mortgage until the sale of the Vegas Property. Thus, these is not just one, but two hurdles standing between Jimie Owsley and her efforts to be reimbursed. Further, no conflict of jurisdiction exists here because this Court is not reviewing the merits of the Second Enforcement Order. That the unique jurisdictional requirements under Texas law for enforcement orders requires this Court to look at the record in the state court at the time of entering the Second Enforcement Order does not necessarily suggest this Court's review fully overlaps with the Texas appellate court. As prescribed by *Shepherd*, this Court has stuck to the "face" of the state court record. 23 F.3d at 925. And as it pertains to substantial justice, the Court is inclined to credit Brian Owsley's repeated and often stymied efforts at executing the sale of the Vegas Property and obtaining half of its net sales proceeds. In short, the Court finds no cause to stay its hand here and collateral estoppel applies full force to the Second Enforcement Order.

### 2.    The Second Enforcement Order's Definition of Net Sales Proceeds

Lastly, Jimie Owsley argues the Second Enforcement Order's definition of "net sales proceeds" should be read to include an offset for mortgage payments made by Jimie Owsley between the Final Decree and the sale of the Vegas Property. Again, the Court disagrees.

As explained above, the Second Enforcement Order did nothing to modify the Final Decree's mandate that Jimie Owsley unconditionally take responsibility for the mortgage payments. Rather, the Second Enforcement Order faithfully adhered to that mandate by not including Jimie Owsley's pre-sale mortgage payments as part of the net sales proceeds to be disbursed between the Parties. Accordingly, the Bankruptcy Court did not err by reading the Second Enforcement Order to exclude Jimie Owsley's pre-sale mortgage payments.

## III.  CONCLUSION

Based on the foregoing, Jimie Owsley's Motion is **DENIED** and the Bankruptcy Court's disbursement order is **AFFIRMED**.

It is SO ORDERED.

Signed on July 17, 2021.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**